AUSA: Lee Janice  Telephone: (313) 226-9740
Special Agent: Elizabeth Weitzel  Telephone: (313) 505-7304

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| | |
|---|---|
| United States of America<br>v.<br>D-1 Kianna Mitchell<br>D-2 Angela Johnson<br>D-3 Antonia Brown | Case No. Case: 2:22−mj−30235<br>Assigned To : Unassigned<br>Assign. Date : 5/17/2022<br>USA V. SEALED MATTER (CMP)(CMC) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **March 2020 through June 2021** in the county of **Wayne** in the **Eastern** District of **Michigan**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 666 | Theft from Program Receiving Federal Funds |
| 18 U.S.C. § 1349 | Conspiracy |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Elizabeth Weitzel*
_Complainant's signature_

Special Agent Elizabeth Weitzel
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: May 17, 2022

_Judge's signature_

City and state: Detroit, MI  Kimberly G. Altman, U.S. Magistrate Judge
_Printed name and title_

Save  Print

# Affidavit

I, Elizabeth Weitzel, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent with the U.S. Department of Labor, Office of Inspector General, Labor Racketeering and Fraud (DOL-OIG/OI-LRF) and have been so employed since May of 2021. Prior to this assignment, I was a Special Agent with Department of Housing and Urban Development Office of Inspector General (HUD OIG) for over 11 years. I am currently assigned to the Detroit Field Office and to the Detroit Metropolitan Identity Theft and Financial Crimes Task Force. I have conducted numerous criminal fraud investigations. I was previously assigned to the Southeast Michigan Financial Crimes Task Force. I have conducted and/or assisted numerous search and arrest warrants related to these violations. I have additional experience and training from the Federal Law Enforcement Training Center regarding criminal activity, economic crimes, and identity theft.

2. Prior to my employment with HUD OIG, I was a Corporate Investigator and Bank Officer from July of 2006 until March of 2010. I investigated cases involving mortgage fraud, wire fraud, consumer-loan fraud, counterfeit-check fraud, identity theft, embezzlement, bank robberies, and various financial institution fraud.

3. As a Special Agent with DOL OIG I have conducted multiple investigations into criminal violations of Title 29 and Title 18 of the United States Code, including but not limited to the target offenses detailed below. During this time, I have become familiar with and worked with special agents who have over 30 years of law enforcement experience investigating criminal schemes targeting the State of Michigan's Unemployment Insurance Agency through the filing of false or fictitious Unemployment Insurance claims. I have become familiar with the methods that criminals use to attack and exploit the Unemployment Insurance systems as well as tools and methods criminals often utilize to facilitate that fraud. More recently, this type of fraud surrounds Pandemic Unemployment Assistance claims.

4. The facts of this affidavit come from my personal observations, my training and experience, and information obtained from my review of financial documents, other records received, interviews conducted, and information

provided to me from joint investigating agencies. This affidavit is submitted for the sole purpose of supporting a criminal complaint and arrest warrants and does not set forth all of my knowledge about this investigation.

5. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that **Kiannia Mitchell**, **Angela Johnson** and **Antonia Brown,** have committed various federal crimes, including, but not limited to, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Theft from Program Receiving Federal Funds (18 U.S.C. § 666), and conspiracy to commit those crimes (18 U.S.C. § 1349).

## Summary

6. This investigation is focused on a Pandemic Unemployment Assistance (PUA) and Unemployment Insurance Assistance (UIA) fraud conspiracy, committed by former State of Michigan employee **Antonia Brown**, and non-employees **Kiannia Mitchell** and **Angela Johnson**.

7. The investigation, to date, has shown that starting in March 2020, **Mitchell** and **Johnson** utilized two distinct residential Internet Protocol (IP) addresses to file and/or access over 123 PUA claims, resulting in the outlay of approximately $1.6 million in federal funds earmarked for PUA and UIA benefit payments. Those payments were issued through the U.S. Mail and through wire transfers utilizing the nation's electronic financial infrastructure.

8. During that time, **Brown** was a long-time State of Michigan Unemployment Insurance Examiner (UIE), assigned to the Benefit Payment Control Unit. **Brown** was responsible, in part, for reviewing, approving, and adjudicating various PUA and UIA claims. Records from the SOM FIU show that **Brown** accessed approximately 110 of the claims filed by **Mitchell** and **Johnson**, in which she altered and/or authorized payment on approximately 101 of them. The SOM FIU confirmed that **Brown** had no legitimate reason to access or modify, let alone approve the subject claims, indicating **Brown** used her position as an employee to inappropriately access and wrongfully release payments tied to the claims associated with **Mitchell's** and **Johnson's** IP addresses.

9. Additional records obtained and interviews conducted throughout this investigation, determined **Brown** maintained a personal relationship with both **Mitchell** and **Johnson**, and they communicated with each other regarding the claims in question. Additionally, both **Johnson** and **Mitchell** admitted they received money from third parties to assist them with their claims, via CashApp and that they paid **Brown** via CashApp for her assistance. A review of CashApp records of **Mitchell**, **Johnson** and **Brown's** accounts, confirmed that all three received numerous payments from multiple individuals, and showed **Brown** received multiple CashApp payments directly from **Mitchell** and **Johnson,** during the time she was accessing and altering the claims in question.

## Unemployment Insurance – Background & COVID-19

10. The Social Security Act of 1935 initiated the federal and state unemployment insurance (UI) system. The system provides benefits to individuals who are unemployed. In the State of Michigan, the UI system is administered by the Unemployment Insurance Agency.

11. State unemployment systems and benefits are joint state and federal enterprises largely financed on private employers located in that state. At the time of this application, the federal government had provided significant supplemental benefits for the states as a result of the Covid-19 Pandemic. Beginning in, or about, March 2020 and continuing through the present, various federal programs allowed for the significant outlay of federal funds to flow to and through the states to offset the historic need for unemployment benefits by the American workforce, including the State of Michigan and in the Eastern District of MI. Those federal funds were supplemented for unemployment benefits through multiple government programs and have come to be known as Pandemic Unemployment Assistance (PUA).

12. Normally, in the absence of fraud, an individual initiates a UI claim by submitting a claim in person, over the telephone, or on the internet through the State Workforce Agency (SWA) website. To qualify for UI benefits, the claimant must demonstrate a certain level of earnings in several quarters immediately preceding the application. The amount of unemployment benefits the UI claimant qualifies for depends on a variety of factors, including but not limited to, the length of his or her previous employment and the number of wages he or she earned.

13. The SWA will approve or reject a UI claim based on the application and information provided by the claimant. If the SWA approves a UI claim, the claimant is required to re-certify the claim via telephone or internet, at various times throughout the claim process. The claimant must also certify that he or she is still unemployed and actively seeking work.

14. Once an application is approved, the SOM provides unemployment benefits through two financial means: a debit card, issued by Bank of America, which is mailed to the claimant through the U.S. Postal Service, and then unemployment benefits are loaded onto the debit card electronically; or through the claimants provided bank account number, where the benefits are directly deposited to that bank account, through electronic funds transfers (EFTs).  The EFTs originate from one or more accounts maintained by the Michigan UIA at Bank of America, a financial institution as defined by 18 U.S.C § 20.

15. Bank of America outsources the processing of transactions on UI prepaid cards to a vendor, Visa DPS [note "DPS" stands for debit processing solutions.] Visa DPS has two platform processor data centers that house all the UI prepaid card data for the Bank.  The data centers are located in Ashburn, Virginia and Highland Ranch, Colorado. Any transaction made on a prepaid card, including loading of funds, POS transactions, and ATM withdrawals, passes through one of these two data processor centers.

16. UI prepaid cards are mailed from one of five locations, all located outside of the state of Michigan.

17. The SOM FIU confirmed that the subject PUA/UIA claims involved in the above scheme, received payment through both mailed debit cards and EFT's directly to bank accounts.

### Unemployment Insurance – Fraud Prevention

18. To prevent fraud, the SWA website captures certain data surrounding the interaction between an individual and the UI system, through a unique system for each State.  The State of Michigan, Unemployment Insurance Agency, uses the Michigan Integrated Data Automated System (MiDAS). Each time a claim is accessed, MiDAS, creates a digital footprint by collecting data including dates, times, IP addresses, and Media Access

    Control address associated with a device accessing a claim. The SWA and SOM systems ties this information to the user-entered information captured to facilitate the claim (i.e. name, address, social security number, BOA or other bank account numbers, banking routing numbers, etc.). It is through analysis of this data that the SWAs and investigating agents can identify fraudulent trends and tendencies associated with certain claims.

19. MiDAS also utilizes certain proprietary algorithms that automatically identify and stop possible fraud. Additionally, employees who review claims and conclude that the payments may be involved in fraud, can also take action to stop payment of the claims. Each of the above is referred to as a "fraud-stop."

20. In an effort to prevent fraud, SOM Unemployment Insurance Agency, also captures internal data surrounding the interaction between SOM employees, contractors, consultants through MiDAS. MiDAS maintains an "audit trail," which details any employee who touches, alters, or otherwise modifies a claim. An employee is identified in MiDAS through their required unique credentials/username. The SOM maintains workflow logs of each employee that detail which claims are assigned to a particular employee. The SOM also maintains call logs that document telephonic contact between employees and claimants. Those workflow logs and call logs detail whether employees had a legitimate reason to access or modify a claim.

21. Investigators from SOM's FIU can access and review the data maintained for both claimants and employees in MiDAS. It is through the analysis of this data that investigating agents can identify fraudulent trends and tendencies associated with certain claims.

## Claims Examiner Antonia Brown

22. **Brown** has been employed by the State of Michigan since 2002. During the period of this scheme, she was assigned to the Benefit Control Payment Department. **Brown** was assigned claims to review and other work items within the SOM's workflow systems, using SOM equipment and the MiDAS system. UIE's provide services to claimants, employers, and the public.

23. In order to access the MiDAS system, Brown was assigned an account with a unique username.

24. When teleworking, SOM FIU employees must be logged in to the State of Michigan's virtual private network (VPN) to access the MiDAS system. **Brown** used her username to access the VPN as well.

25. In addition to a username, Brown was assigned a unique security token. To log into the VPN, she was required to enter a code generated by the security token. The code, unique to each employee, alternates in intervals.

26. SOM FIU disclosed that between March 2020 and June 2021, **Brown** acted outside the scope of her authority by electronically accessing, altering, and approving approximately 101 claims, all of which were associated with **Johnson's** and **Mitchell's** residences.

27. The SOM FIU confirmed that the SOM UIA maintains various software, including the Fraud Manager System, which scores every UI claim once filed. Based on that system generated score, the system will flag a claim based on internal findings, which will stop payment on those claims, until additional information and a review by an employee to verify that information, is completed. Those various system generated flags can include but are not limited to, fraud stops, wage discrepancies, IP addresses associated with multiple claims, bank accounts associated with multiple claims etc. In this case, various flags were placed on the 101 claims originating from the **Mitchell** and **Johnson** IP addresses that were accessed and altered by **Brown**, including but not limited to, fraud stops and non-monetary issues. Brown removed those flags on those claims, outside the scope of her duty, which released payment on those claims, resulting in the outlay of over $1.6 million dollars in PUA and UIA funds.

28. Based on my training and experience and through discussions with other seasoned agents, I know over 100 PUA and UIA claims originating from two distinct IP addresses, and fact that Brown used her employment, outside the scope of her duties, to remove system generated flags, put in place to stop unentitled payments, is indicia of a large-scale fraud scheme.

## Probable Cause

29. In June of 2021, I initiated an investigation after the SOM FIU identified a suspected fraud scheme involving **Brown** and others, aimed at defrauding

the government of millions of dollars earmarked for PUA and UIA. The SOM FIU and DOL OIG recognize this activity, as many prior investigations have involved similar schemes since the onset of the pandemic in the spring of 2020. The scheme works through the online submission of claims by outsiders targeting the State of Michigan UI systems. Once the claims are filed, the outsiders signal a State of Michigan employee, such as **Brown**, who then uses their employment to "push" the claims through for approval and payment.

30. In this instance, SOM FIU identified two IP addresses, xxx.x.xx.80 (IP .80) and xx.xx.xxx.82 (IP .82), responsible for filing approximately 123 PUA and UIA claims between March 2020 and June 2021.

31. Based on my training and experience and through discussions with other seasoned agents, I know over 100 PUA and UIA claims originating from two distinct IP address is indicia of a large-scale fraud scheme. MiDAS systems had also flagged many of these claims as fraudulent.

32. Agents obtained records from the Internet Service Providers (ISPs) associated with IP.80 & IP.82 and learned that the IPs were statically assigned to two residences located within the EDMI. Physical surveillance of both locations revealed that each appeared to be a single-family residence and not a storefront or commercial location that would have reason to file dozens of claims.

33. During the review of the claims originating from the subject IP addresses, investigators found a common link between them. MiDAS records showed that a particular State of Michigan employee, **Brown,** had accessed, altered and/or approved approximately 101 of those subject claims.

34. SOM FIU reviewed **Brown's** work activity, which confirmed **Brown** was not authorized to access, let alone alter or approve, any of the claims in question. Furthermore, **Brown** removed many of the fraud stops placed on the claims by MiDAS.

35. Additionally, SOM-FIU disclosed that **Brown** was required to utilize the State of Michigan "in Contact" call center software phone system supplied to her to speak with claimants, employees, and or the public. SOM FIU ran all the phone numbers called by **Brown** within the "in Contact" system against all the phone numbers listed for the 101 PUA and UIA claims that

**Brown** accessed, altered, or approved and none of them were listed on **Brown's** "in Contact" call history. This indicates that **Brown** circumvented the "in Contact" software to conspire with other individuals, acting outside the scope of her to duties, to push through these claims.

36. In total, **Brown's** direct actions, outside the scope of her duties, resulted in the approval of approximately 101 claims, which resulted in the outlay of over $1,661,821.94 in PUA and UIA claims.

## IP .80 Identification

37. Agents obtained records from AT&T confirming that IP .80 was a static IP address assigned to the residence located at the 3XXX3 Cherokee Drive, Romulus, MI, 48174. AT&T records showed the account was held in the name of S.V., who was identified as **Mitchell's** husband. The account listed a contact phone number of (248) XXX-X483 and a contact email address of XXXXXXXXXXXXXXX25@gmail.com.

38. Agents obtained DTE records for 3XXX3 Cherokee Drive, Romulus, MI, 48174, which showed that account was held in the name of **Kiannia Mitchell**, with the telephone number (248) XXX-X483 and an email address of XXXXXXXXXXXXXXX25@gmail.com.

39. MiDAS records show that IP .80 filed/or accessed over 55 unique PUA and UIA claims. Review of those claims show that over $700,000 was paid out on those claims. This level of activity originating from a single static address is indicative of fraud.

40. MiDAS records show that **Brown** accessed and adjusted most of the claims associated with IP.80, which resulted in the outlay of approximately $710,489.13. SOM FIU reviewed **Brown's** confirmed **Brown** had no legitimate reason to access or approve the claims.

41. Review of IP .80's claims showed a claim filed in the name of **Kiannia Mitchell** in May 2020 listing the 3XXX3 Cherokee Drive, Romulus, MI, 48174 as the mailing address. Agents also identified a claim in S.V.'s name filed from IP .80.

42. MiDAS records show that **Brown** altered **Mitchell's** claim nine times between September 2020 and February 2021. In one instance, **Brown** discarded a fraud investigation that had been placed on the claim. Furthermore, SOM FIU determined that **Brown** inappropriately discarded an employer protest alleging that **Mitchell** was not entitled to PUA benefits. Furthermore, **Mitchell's** claim was not assigned to **Brown** nor did the State of Michigan have any record of official contact between **Brown** and **Mitchell**.

43. T-Mobile records for **Brown's** cell phone number confirmed that **Brown** was in direct communication with **Mitchell** through two separate phone numbers registered to **Mitchell**, from July 2020 through August 18, 2021.

44. AT&T records for one of **Mitchell's** cell phone numbers confirmed that **Mitchell** was in direct communication with other phone numbers associated with the PUA and UIA claims filed and/or accessed through her IP address.

### IP .82 Identification

45. Agents obtained records from Comcast that confirmed IP .82 was a static IP address assigned to the residence located at the XXX35 Ilene St. Detroit, MI, 48221. Subscriber data identified **Angela Johnson** as the account holder, with a contact phone number of (313) XXX-X246 and a contact email JXXXXXX-XXXXXr@comcast.net.

46. Agents obtained DTE records for the XXX35 Ilene St. Detroit, MI, 48221, which showed utilities, were registered to **Angela Johnson**, with the telephone number (313) XXX-X246 and an email address of gXXXXXXXXXXX074@yahoo.com.

47. Agents obtained records from SOM FIU that reported that **Johnson's** telephone number, (313) XXX-X246, was used to set up UI MiLogin accounts for twelve PUA/UIA claims.

48. A review of MiDAS records show that IP .82 filed/or accessed over 51 unique PUA and UIA claims. Review of those claims show that over $900,000 has been paid out on the associated claims.

49. Of the 51 claims filed by IP .82, **Brown** accessed and/or approved over 46 of those claims. **Brown's** actions resulted in the outlay of over $951,332.81 attributable to IP .82. A review of **Brown's** assigned work items detailed that **Antonia Brown** had no legitimate reason to access, let alone approve the claims.

50. Review of IP .82's claims showed a claim filed in the name of **Angela Lee Johnson** in March 2020, listing XXX35 Ilene St. Detroit, MI, 48221 as the mailing address.

## Search Warrant

51. On September 29, 2021, during the execution of federal search warrants, agents interviewed **Mitchell**, **Brown**, and **Johnson**.

52. During **Mitchell's** interview, she admitted to accessing over 55 PUA/UIA claims from her residence, for her friends, family and associates, and admitted to speaking with and obtaining internal information from **Brown** regarding those claims. **Mitchell** stated she obtained each claimant's username and password and then accessed their account from her computer, and in most cases uploaded information on their behalf. **Mitchell** further admitted that she discussed most of those claims with **Brown**. **Mitchell** stated she received payment from each person she assisted and occasionally paid **Brown** as a thank you for **Brown's** assistance, via CashApp.

53. During **Johnson's** interview, she admitted to helping at least 15-20 people with PUA/UIA claims. **Johnson** also admitted **Brown** assisted her with those claims, including removing fraud stops on some of those claims. **Johnson** admitted to receiving payment from the claimants she assisted, and confirmed she also paid **Brown** for her assistance, via CashApp.

54. During **Brown's** interview, she confirmed she was friends with both **Mitchell** and **Johnson** and admitted to speaking with both about some of the claims in question. **Brown** confirmed she received payments from **Mitchell** and **Johnson**, via CashApp, during the time she was assisting with the PUA/UIA claims, but claimed the payments were unrelated to her assistance

with those claims; however, **Brown** also admitted that she received payments directly from some of the claimants themselves.

55. I obtained and reviewed records associated **Mitchell**, **Johnson** and **Brown's** CashApp accounts, detailing transactions during the above-mentioned scheme time frame. Those records corroborated **Mitchell's, Johnson's** and **Brown's** admissions, and confirmed the following:

    a. **Brown's** CashApp account showed **Brown** received a total of $50,500.09 in CashApp payments, which included $5,075 from **Johnson** and $2,325 from **Mitchell.**
    b. **Mitchell's** CashApp account showed **Mitchell** received a total of $108,860.91 in CashApp payments.
    c. **Johnson's** CashApp account confirmed **Johnson** received a total of $54,537.50 in CashApp payments.

## CONCLUSION

56. Based on the forgoing, there is probable cause to believe that **Antonia Brown, Kiannia Mitchell,** and **Angela Johnson**, have committed federal crimes, including but not limited to mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), conspiracy to commit mail and wire fraud (18 U.S.C. § 1349), and fraud concerning programs receiving federal funds (18 U.S.C. § 666), in connection with a scheme to defraud the federal/state unemployment insurance program and obtained unemployment benefits, by means of false and fraudulent pretenses and representations.

Respectfully Submitted,

_____
**Elizabeth Weitzel,** Special Agent
U.S. Department of Labor – OIG

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_____
**HON. KIMBERLY G. ALTMAN**
United States Magistrate Judge

Dated: May 17, 2022